# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| LINDA G. ADAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 10-CV-3126-NKL |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## ORDER

Before the Court is Plaintiff Linda Adams's Social Security Complaint [Doc. # 3] brought under 42 U.S.C. §§ 405(g) and 1383(c) to review a decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income. Because the Court finds that the decision of the Administrative Law Judge ("ALJ") was based on substantial evidence, the Court denies Plaintiff's Complaint.

**I.     Background[1]**

Adams filed her applications for disability insurance and supplemental security insurance benefits on May 24, 2007, alleging that she became disabled beginning October

---

[1] The facts and arguments presented in the parties' briefs are duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

13, 2005 at the age of 35. She lives with her teenage son. Adams, who has a high school degree, has past relevant work as a waitress and as a housekeeper.

In 1995, she went to work at Silk Road restaurant and worked there five days a week until 2002. In 2002, she went to work at Hong Kong City after Silk Road was sold. She worked at Hong Kong City until going to work at Century Buffet in the summer of 2006. After leaving Century Buffet some time in 2007, she went to work at Bumsteads restaurant. During the summer of 2007, she also cleaned some houses for extra income. She continued to work at Bumsteads part-time between 25-30 hours a week at the time of the hearing.

Adams testified that her part-time job at Bumsteads aggravated her mental problems. Specifically, she stated that the stress of talking to customers caused her to become short of breath, and forced her to either go into the bathroom to calm herself or leave work early on several occasions. Adams stated that she continues to work because she must support her son.

### A. Medical Background

At a psychiatric evaluation at Burrell Behavioral Health ("BBH") in December 2005, with Virginia Jones, N.P., M.H.N.P., and James Neal, M.D., Adams reported that she had been out of work for two months after her employer went out of business. She was not taking her medication regularly. Adams was assessed with major depression, panic disorder, and a Global Assessment of Functioning ("GAF") score of 50, indicating serious symptoms or serious impairment in social or occupational functioning.

At a March 10, 2006 appointment at BBH, Adams was noted to be medication noncompliant. It was suspected that she was overusing Xanax, which was making her forgetful. At an April 17, 2006 counseling appointment, Adams reported working for about a month and was looking for a second job.

Two months later, Adams reported doing "pretty good" with no panic attacks and better sleep. [Tr. 257.] She was described as "much improved." *Id.* Her GAF was improved to 55, indicating moderate symptoms or moderate difficulty in social or occupational functioning.

At her next appointment in October 2006, Adams was not feeling well due to four abscessed teeth. She had failed to refill one of her medications without explanation.

In December 2006, Adams was depressed about continued dental problems. She had again run out of medication several weeks earlier. Adams planned on getting another job once she started to feel better.

At her next appointment in March 2007, Adams reported a one-month history of depression and daily panic attacks. She was experiencing a number of family stressors, and she was moving out of town. Adams had elected to stop taking one medication on her own, and was using another medication that was given to her by a friend. She was given medication samples and met with BBH staff to get signed up for a prescription assistance program to receive low cost prescriptions.

Adams underwent a psychological assessment with David J. Lutz, Ph.D., on August 16, 2007. After examination, Dr. Lutz opined that Adams was capable of understanding and

remembering simple to moderately complex instructions, and possibly even complex instructions. Adams was able to sustain concentration and persistence on simple and moderately complex tasks and possibly some complex tasks. Dr. Lutz also indicated that Adams seemed able to interact in at least moderately demanding social situations and was able to adapt to her environment. He assessed a GAF score of 55.

At a November 14, 2007 appointment with Jonathan Boswell, a certified physician's assistant, Adams reported increasing anxiety and depression after she lost insurance coverage and stopped taking her psychiatric medication. An undated note from Mr. Boswell indicated that Adams was working full-time as a waitress.

On May 4, 2009, Adams was first seen by Antonio Dimalanta, M.D., for panic attacks and depression. She was working as a waitress. During examination, Adams was "mildly" anxious but was able to relax over the course of her interview. [Tr. 437.] She was fully oriented and performed "okay" on simple problem solving tasks. *Id.* Adams had "good" memory and recall and her judgment was not impaired. *Id.* Dr. Dimalanta assessed panic disorder with agoraphobia, recurrent moderate major depression, and a GAF score of 60 to 65, indicating some mild symptoms or some difficulty in social or occupational functioning.

One month later, Adams reported continued problems with depression and anxiety. Adams was working as a waitress, but she had to force herself to work. Dr. Dimalanta made some medication changes.

On a Medical Source Statement - Mental checklist form dated June 22, 2009, Dr.

Dimalanta indicated that Adams had "marked" limitation of her ability to work in coordination with or proximity to others without being distracted by them. [Tr. 458.] He also indicated that Adams had "moderately limited" ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and travel in unfamiliar places or use public transportation. *Id.* He further opined that Adams had "mildly limited" ability to: carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; interact appropriately with the general public; and respond appropriately to changes in the work setting. *Id.* Dr. Dimalanta opined that Adams's impairments had lasted or were expected to last at least 12 months, she was not a malingerer, and she was still working as a waitress.

At the June 26, 2009 administrative hearing, Adams testified that she was working between 25 and 35 hours a week as a waitress. She had been working at the same establishment for over one year. Adams testified that she "probably" would have worked full-time if she had been offered full-time work in 2006 and 2007. [Tr. 29.]

**B.     The ALJ's Decision**

The ALJ conducted the five-step sequential evaluation process called for in Social Security regulations 20 C.F.R. §§ 404.1520 and 416.920. At step one of the process, the ALJ concluded Adams had not engaged in significant gainful activity since the alleged onset of her disability. At step two of the process, the ALJ concluded Adams suffered from the following severe impairments: anxiety disorder, depression, and personality disorders. At step three of the process, the ALJ concluded that Adams did not have an impairment or combination of impairments that met or equaled one of the listed impairments.

At step four of the process, the ALJ concluded that Plaintiff Adams possessed the residual functional capacity to perform her past relevant work despite her impairments. The ALJ found that "Dr. Lutz reported claimant would be capable of performing simple tasks and possibly some moderately complex tasks, seemed able to interact in at least moderately demanding social situations, and seemed able to adapt to her environment." [Tr. 15.] The ALJ accorded Dr. Dimalanta's assessment little weight, noting that Dr. Dimalanta had not seen much of Adams at the time he gave his opinion. Additionally, the ALJ concluded that Dr. Dimalanta provided no rationale for his individual check marks, and his progress notes revealed no findings, tests or measurements to explain them. Moreover, the ALJ found the opinion of Dr. Dimalanta to be inconsistent with other evidence of the record.

In determining her residual functional capacity, the ALJ found that Adams's complaints were not fully credible in light of the reports of treating and examining practitioners that showed essentially normal physical findings, her lack of treatment for

any physical conditions, her poor work history, her ability to work at a job that required working with the public, her ability to care for her son, her daily activities, and because her medications controlled her symptoms enough that her GAF scores range from mild to moderate even when she is not fully compliant in taking her medications. The ALJ also noted that Adams's income had increased since her onset date, and she has not been fired from any jobs due to an inability to perform. Therefore, the ALJ found that Adams was physically and mentally capable of performing her duties, and may simply lack motivation to work.

The ALJ concluded that Adams possessed the following residual functional capacity: "capable of work at the medium exertional level; cannot interact with the public on a frequent or prolonged basis; is limited to the performance of simple, routine tasks because she cannot sustain concentration when given highly stressful activities; cannot do fast pace work activities, quota work, or work that has deadlines or schedules; and cannot tolerate change in work settings." [Tr. 17.] The ALJ noted that the vocational expert testified that Adams's past relevant work as a waitress was light in exertion and semi-skilled, and the work she performed as a housekeeper was light in exertion and unskilled. The ALJ further found that Adams was a younger individual with a high school education and transferability of skills was not an issue.

The ALJ also noted that in response to a hypothetical question approximating the situation of Adams, the vocational expert testified such a person was capable of performing Adams's past job as a housekeeper consistent with her residual functional capacity, age,

7

education and work experience. Accordingly, the ALJ found that Ms. Adams was not disabled.

## II. Discussion

### A. Standard of Review

In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### B. Plaintiff's Arguments

On this appeal from the ALJ's decision, Plaintiff Adams argues that, in determining her residual functional capacity, the ALJ did not properly (1) consider the opinion of her treating physician, and (2) analyze her credibility. [Doc. # 11 at 11.]

#### 1. The ALJ's Consideration of the Treating Physician's Opinion

Adams first argues that the ALJ did not properly consider the opinion of Plaintiff's treating physician, Dr. Dimalanta. While a treating physician's opinion is generally entitled to controlling weight, such is only the case where "it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)). "'An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* (quoting *Goff*, 421 F.3d at 790). Under 20 C.F.R. § 404.1527(d)(2), when the ALJ does not give the treating source's opinion controlling weight, he considers the following factors in determining the weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) "supportability" – i.e., the evidence a medical source presents to support an opinion – and (4) the consistency of an opinion with the record as a whole.

Here, the ALJ noted that Dr. Dimalanta provided no rationale for his individual check marks, and his progress notes revealed no findings, tests or measurements to explain them. Moreover, the ALJ found the opinion of Dr. Dimalanta to be inconsistent with other evidence of the record. In contrast to Dr. Dimalanta's diagnosis, Dr. Lutz had found that Adams would be capable of performing simple tasks and possibly some moderately complex tasks, seemed able to interact in at least moderately demanding social situations, and seemed able to adapt to her environment. Whereas, Dr. Lutz's findings were supported by the remainder of the record, including Adams's ability to control her symptoms when properly taking her medications, the ALJ found that Dr. Dimalanta's Medical Source Statement was inconsistent

9

with his own limited assessments. When the ALJ made his decision, Dr. Dimalanta had only seen Adams on two occasions, and on the first occasion he assigned her a GAF score of 60 to 65, indicating some mild symptoms or some difficulty in social or occupational functioning.

Additionally, Adams contends that Dr. Dimalanta's opinion is consistent with her own testimony. [Doc. # 11 at 15.] However, the credibility of Dr. Dimalanta's assessments was called into question by the ALJ in part because they were apparently based only on Adams's subjective reports, rather than objective medical evidence. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence.").

For the reasons stated above, the ALJ had substantial evidence to accord little weight to Dr. Dimalanta's assessments. Therefore, Plaintiff's first argument must fail.

### 2. The ALJ's Credibility Analysis

Adams also argues that the ALJ failed to properly analyze her credibility. When analyzing a claimant's subjective complaints of pain, the ALJ should examine factors such as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

Here, the ALJ found that Adams's complaints were not fully credible in light of the reports of treating and examining practitioners that showed essentially normal physical findings, her lack of treatment for any physical conditions, her poor work history, her ability to work at a job that required working with the public, her ability to care for her son, her daily activities, and because her medications controlled her symptoms enough that her GAF scores range from mild to moderate even when she was not fully compliant in taking her medications. The ALJ also noted that Adams's income had increased since her onset date, and she had not been fired from any jobs due to an inability to perform.

For the reasons stated above, Adams's second argument also fails. Substantial evidence supports the ALJ's credibility analysis. The ALJ's credibility analysis and evaluation of the treating physician's assessments fall within the available zone of choice. Therefore, the Court affirms the ALJ's decision finding that Adams was not disabled.

**III. Conclusion**

Accordingly, it is hereby ORDERED that Plaintiff Linda Adams's Social Security Complaint [Doc. # 3] is DENIED.

  s/ NANETTE K. LAUGHREY  
NANETTE K. LAUGHREY  
United States District Judge

Dated: January 13, 2011  
Jefferson City, Missouri